We'll move to our first case, which is 21-2080. And let me just remind everybody that the way we're operating is that if any council would like to remove their mask while you're at the podium, you're free to do that. You're also free to keep it on, whatever you like. The one thing I will ask you to do is please use the button on the right side of the lectern. And raise or lower the lectern so that the microphones are as close as possible so that we can all hear you, keeping in mind that we're also streaming this over the internet. So it's helpful to have the microphone close so we can hear you. And I understand we have Mr. Danaher appearing for the appellate. You do, Your Honor. You would like to keep one and a half minutes for rebuttal. Is that right? That's correct, Your Honor. It's amazingly precise, and we're happy to accommodate you. The clerk and I have had a discussion about whether I could get the half minute allocation, and IT has assured the clerk that we can do that. Well, we have a digital clock. I see that. Of course, you've just used it up now. Clock hasn't started running yet. Is this sound appropriate? Yes, thank you. And we'll let you know if we can't hear you. So why don't you please proceed, Mr. Danaher. Thank you, Your Honor. Good morning, Your Honors. I would like to reserve, as I said, one and a half minutes for rebuttal. This is an appeal from a granting of a motion to dismiss. No appellate court in Connecticut has decided the precise issues which are before this court. Yet the Connecticut Supreme Court has demonstrated that it has a keen interest in those issues. On February 8, 2022, the Connecticut Supreme Court took the rare action, sua sponte, of transferring from the appellate court docket to its docket a case raising similar issues, Hartford Fire v. Moda. Then on March 29, 2022, the Connecticut Supreme Court again transferred to itself from the appellate court a second appeal of the pandemic-related business interruption case, Connecticut Dermatology Group v. Twin City Fire Insurance Company. Those cases have not been argued yet? They have not, Your Honor. They're scheduled to be argued in the first term in September, three months from now. And they are going to be argued on the same day. The court has been very clear about that. Briefing will be completed by the end of this month, and they are going to be ready for argument. In view of the court's responsibilities under Erie and Connecticut Supreme Court's recent actions, we urge this court to consider holding its decision until the Connecticut Supreme Court has spoken in those cases. On 12-16-21, the First Circuit did exactly that in the American Food Systems v. Fireman Fund case, which was docket number 21-1307. Contrary to the argument below by the appellee and the representations made to this court by the appellee and its objection to the appellant's motion to certify, there is no Connecticut law, appellate law, on the issues. Unfortunately, the district court in its decision in this case adopted the appellee's representation that there was and found that losses due to the property's inoperability without physical loss or damage to the property itself are not recoverable, relying on the lack, as it put it, of structural damage in indicating that was required. And it cited for that capstone, which is the position that the appellee had taken below in citing that proposition. However, capstone did not make such a sweeping conclusion of law. In fact, Chief Justice Chase Rogers made it clear in the capstone decision that the court was not reaching the broader issue of whether a property may experience a covered physical loss even in the absence of physical damage. She did this first in footnote 18, rather emphatically, and then she did it again in footnote 21, where she wrote on behalf of the court, we take no position on this matter. Is there any discernible difference between Connecticut insurance law and New York insurance law on this issue? I do. Well, first of all, I think there is no precise Connecticut law which you can then compare to New York law and say there is or is not a difference. But I can point you to a difference between, a significant difference between New York and Connecticut law if you'll bear with me just one minute. And I ask, of course, because there is the Second Circuit holding in 10012, which is interpreting the same language. So whatever distinguishing arguments you have about capstone, that wouldn't be true for that case, although it is, of course, New York law, not Connecticut law. Yeah, and of course, in 10012 holdings, the Second Circuit relied on roundabout, which was an appellate division decision, which found for the insurer precisely on this issue. Connecticut doesn't have that same finding. And if I could point you to a couple of issues in Connecticut that I think would be instructive on this, and one they spin around and come to a comparison to Connecticut law, I mean to New York law, which distinguishes Connecticut law from New York law. If I could just have a minute to do that, I'd like to do that. Two cases of importance with regard to that are the Beach case decided by Chief, well, the decision was written by Chief Justice Peters and then the Karras case. They both defined collapse and said that collapse was ambiguous. And in those findings, they said that if the insurer had wanted to define the term in a more precise way, it was capable of doing so. Beach was a 1987 decision. Karras was a 2019 decision, both making the same point. In New York, the word collapse has not been found ambiguous, which it was in Beach and Karras, but rather in Peruta versus Encompass Insurance Company, the appellate division, second department at 136, NY supplement third, 453, found no ambiguity with regard to collapse, the word collapse. And my point is you can have a sense of rules of construction being similar, but how they are applied by the two states, the courts in the two states, are different. So to get to the core of your argument, if we were not to certify it, what is the definition, or hold it, what is the definition of physical loss that you advocate we adopt? First of all, I'm not asking for certification at this point, Your Honor, I'm asking for a holding penalty. But I think loss is different from damage. And loss is separated from damage by the disjunctive or. I understand that, but what precise definition of physical loss do you advocate? Loss of use. Complete loss of use? No, it doesn't have to be, it can be partial loss of use. In Connecticut, the real property includes actual space, airspace, and that's by statute. In Chapter 47, Section 202, real property is to include spaces that may be filled with air. So airborne particles inside a room such as this become part of the environment and part of the real property. So then what is the work done by the word physical in your view? How is physical not superfluous? I don't mean to interrupt. I'm sorry, perceivable. In other words, we all perceive right now the imminent threat of the particles that are in the air. Look what we're doing. We're social distancing. We're wearing masks. We perceive that threat. That's what. What if there were, hypothetically in your scenario, an approaching hurricane and the state shut down all of the beach restaurants and said, well, we don't know. It could be hurricane so and so that's on its way. And therefore, we're shutting down all the restaurants for a week. In your view, is that a physical loss? I think that rides on the reasonable expectations of the insured. A beachfront restaurant has a reasonable expectation of that risk being there. Why is the reasonable expectation of the risk there the same as whether it's physical? What if 10 years from now, under your scenario, everything's shut down for COVID? You say, well, gosh, we've been living with COVID for 10 years. We all know. We all know that COVID's out there. Of course, we expect it. But that doesn't change whether it's physical or not, right? Well, 10 years from now, your honor, we will have policies that will be issued that in the environment of a continuing pandemic are no longer fortuitous. They're not covering fortuitous events because you see them coming. Well, how about a variation on Judge Nardini's hypo, which is that there's a massive snowstorm that hits and the restaurant is shut down for a week as a result. Is that a physical loss? I think it is a physical loss as such, but I don't think it's a covered loss because I think a snowstorm is something that is expected in the normal course of activity and doesn't meet the fortuity. What if it snows in August? Climate change and all that. And it snows in August and it shuts down all of the restaurants in East Haven. Yeah. Really? I know we're playing with hypotheticals, but again, it seems like you're distinguishing between two things. One is the fortuity and the expectedness. But how does that tie into the word physical, which is, I thought, the word that we're trying to figure out. Is it a physical loss? Well, Your Honor, one thing I don't want to lose sight of is the fact that damage is one thing. Loss is another. And if physical loss is the same thing as damage, then it is inconsistent with Connecticut law because Connecticut law disfavors redundancy. Well, it could be a subset. You could have physical loss, right? This is an available interpretation. Or damage that doesn't constitute loss, right? In other words, you could have damage that results in loss of the use of the facility, or you could have damage to the facility that doesn't result in loss of use of the facility. With all due respect, Your Honor, you would be rewriting the insurance policy if you did that. You've rewritten it to include anticipated snowstorms and the like. Well, I'm not including the anticipated snowstorms. Judge Nardini is including the anticipated snowstorms. I am saying that all you have to do in interpreting the policy is what is typically done in insurance coverage interpretation is go to definitions. And if you go to the definition of loss, you find the word deprivation. And that is what I contend loss includes here. And in Connecticut, a reasonable interpretation, even though the insurer may have a reasonable interpretation, a reasonable interpretation by the insured carries the debt. But loss is defined, right, in the policy as meaning accidental physical loss or accidental physical damage. And physical is in both halves. I agree. I agree. So I'm still having trouble perceiving the physical loss when the government says there's illness out there and so we're going to close everybody down for the time being. Where is the physical loss or physical damage? And loss and damage are pretty easily distinguished. If a meteor falls on your restaurant and wipes it out, you've lost it. If the meteor falls close and knocks down a window or something, that's damage. But they're both physical. That's correct, Your Honor. But you can't separate physical and loss. And physical is defined as something that which is perceptible. And it is perceptible to us that there is an imminent threat of the COVID-19 virus. You know, posing a risk to the interior of the property if it isn't handled correctly. But it doesn't damage the property. It damages the people who are in them. Well, that would be that would be a fact. I get the germs and then I come up coughing and sore throat and everything else. The tables and chairs and walls and plates all stand. Well, that would be a factual determination, which on a motion to dismiss, I don't think the court is in a position to rule on. Meanwhile, some of the cases find that odors, cat urine, friable asbestos in the air are all areas of coverage, even though the structure itself isn't incurring physical loss. And by the way... Well, that's not consistent with Capstone unless we agree with you that Capstone is limited in predicting what the Connecticut Supreme Court would do in only defining physical injury, right, and not how it would understand physical loss or physical damage. In Capstone, the grant of coverage was loss of the use of tangible property, I'm sorry, injury to tangible property, including all resulting loss of use of the property. Physical injury to tangible property. That's one part. Second part, and loss of use of tangible property that is not physically injured. Right, that's the carve out in the footnote, not terminated by Capstone. That's correct. That's correct. It is that to which Capstone did not speak. The second half of that, Chief Justice Rogers made clear she wasn't speaking to, nor was the court, because it wasn't briefed, as you will see in footnote 18. So we have kept you up well beyond your time. We thank you. I see that. You still got your minute and a half. Why don't we hear from the appellee? And I understand, let's see, we have Mr. Litchfield, is that right? Yes, Your Honor. There you are. I'm looking the wrong way. You're hiding behind the monitor. Why don't you come up and we will hear from you. Looks like counsel and I would be well matched in a game of one-on-one. I'll not play with the buttons. Good morning. May the court please. My name is Daniel Litchfield. I represent the Appellee at Cincinnati Insurance Company. Cincinnati wants me to make it clear on the record that it has no lack of sympathy for Farmington or others similarly situated. The pandemic has been terrible and it has left none of us unaffected. But what we're here for is to determine a dispute about commercial property insurance policy. And Mr. Litchfield, I apologize for jumping in so early. Would you tell us your view on the initial request of the appellant that we just park this case and hold on to it to wait and see what the Connecticut Supreme Court does this fall or if they hear arguments this fall. It depends on how long it takes them to decide the case. It could be into the 2023, I suppose. You know, you're the appellee here. So is there any harm to your client if we were to just put this case on ice? There's harm to my client, to be sure, and I think harm to the system more broadly. Look, Farmington has already asked for certification and that was denied by another panel. It's now on its second motion for certification raising this. Yeah, I mean, our motions panel has never really certified. That's a question that's left for the merits panels generally. But putting aside certification. Putting that aside. Why not just hold the case and just wait and see? For the same view. As you, I would expect, anticipate, you would anticipate winning before or having this issue resolved in a manner favorable to your client and for the Connecticut Supreme Court, then, you know, we wind up just affirming down the road. And if for some reason the Connecticut Supreme Court in a manner unforeseen to you right now were to rule the other way, then it would seem odd, wouldn't it, that we would simply affirm and then it turns out later, well, guess what? The Connecticut Supreme Court goes the other way. And we are bound by what the Connecticut Supreme Court says, right? Your Honor, the reason I think it's bad policy is because it can always be argued that if the court just tables everything, the state Supreme Court might get to it. Well, the Supreme Court might get to it in any case, of course. They might someday get to an issue. But we've had any number of issues where the state highest court never gets to the issue. Here, it's quite different, isn't it? When the state, the Supreme Court has not only, it has certiorari jurisdiction. It doesn't only grant cert on this very issue. It actually reaches out, grabs a case from the court below, grabs several cases from the courts below, consolidates them all and says, we're going to decide this issue in September. We're going to hear the case in September. It's only a few months delay. You're already on the upside. No one's told you you have to pay on this policy. So you're sitting pretty. If, as Judge Nardini points out, if we're all correct in thinking that it's more likely that the Connecticut court will come out one way than the other, then you win in the end and no harm to anyone. But it's a little different if we just, that would seem the more conservative course. Because if we predict how the Connecticut court is going to come out, which is what we're normally supposed to do, and we guess wrong, then a couple of months later, it turns out you should have paid on the policy. What happens then? Do they get to reopen this case or is this case final then? My disagreement with that scenario is the premise that a couple months later, this exact issue will be resolved. If one digs into these cases, first, Connecticut dermatology in the court below only dealt with a virus exclusion, which is not at issue in this case. There's no virus exclusion on Cincinnati's policy. Now, the argument's been made that because of the absence of a virus exclusion, there must be coverage for virus. But we've told the court in cited cases why the absence of an exclusion doesn't create coverage that does not otherwise exist. That's a virus exclusion case. And one would expect that the Connecticut Supreme Court would weigh in on the virus exclusion. Doesn't determine direct physical loss or damage to property, the issue that we're here for. Are none of the cases that the Connecticut Supreme Court has reached out and touched cases that involve the definition of physical loss? I understood to the contrary. MODA might in some small measure, but not necessarily. In MODA, the courts, the lower court focused on the virus exclusion and the virus exclusion as it would apply under New York law. And then the virus exclusion as it would apply other than New York law. There is, I believe, later a footnote that suggests, but isn't the sole of clarity, that that other law would be Connecticut law, but it also talks a lot about national law. There's a separate policy at issue in MODA. The policy that I just referred to was the property policy, which was all and only about virus exclusions. Put that to the side. There was a marine policy. Very different kind of a policy in a different space in the insurance world. And the marine policy did involve the words physical and loss in the context of the insuring agreement there. It's differently worded, albeit not, I would freely admit, not materially different. Whether the Connecticut Supreme Court reaches that other policy, I think is just an assumption. This was the very tail end of the trial court's decision and wasn't really the driver in the decision that was reached. So my point is that I think that we might end up having to make this decision in this court anyway. And it seems to me that there's a very good likelihood that that'll be the case when you go back and read MODA and what the trial court said there. And you go back and you read Connecticut dermatology and what the trial level court said there. Those are the things that reached down and grabbed up to the Connecticut Supreme Court. I think the most logical interpretation of what went on there is the Connecticut Supreme Court wants to weigh in on the virus exclusion. That's really what those cases were about. It's not at all what this case is about. Can I press on your argument in the lower court determination that capstone controls here, as the other side has argued, pointed to clear distinctions in the policy language and the carve out by the Connecticut Supreme Court in capstone in footnotes 18 and 21. So in capstone you've got physical injury to tangible property. So injury to property seems quite obvious in capstone. That's what they're defining. Is it right that capstone doesn't give us an answer to what the Connecticut Supreme Court will do with physical loss? And in particular their argument, which is some version of it means loss of use of physical property of some kind, discernible loss. It does not give us, at least in our interpretation, the idea that the Connecticut Supreme Court is open to the idea that a lack of physicality could qualify as direct physical loss or damage to property. Yes, it was dealing with different language and a different kind of policy, as was, by the way, the Illinois Supreme Court in the Elder case, which has been followed by the Seventh Circuit and Sandy Point and other decisions on Illinois law as to this aspect of that definition. And the apparent carryover between physical injury to tangible property on the one hand and direct physical loss or damage to property on the other hand and the point is from a predictive point of view, if we're looking at whether non-physical loss is somehow covered by a policy that covers physical loss, then I think capstone is a north star as to that proposition and its facts. So not directly on point, but because it emphasized the use of the word physical in defining physical injury to tangible property, we should infer that it would put the same emphasis on physicality as to loss. Yes, Your Honor. It was focusing on carbon monoxide, which you and I can breathe and we'll go to sleep and never wake up. It's dangerous to people, but it was also focused on the lack of any indication that the carbon monoxide physically, there was any physicality to its impact on the property and the case was about coverage for damage to property. Here, it's not really that big a contrast. We're dealing with the idea that germs, what I used to call germs until the spring of 2020, can be in the air, can be in an area and because they're there, we'll just deem the loss of use of that property because sick people may have come into the property or may come into the property as direct physical loss or damage to the property. But we're lacking that physicality. Physicality is the touchstone of capstone. Kind of proud of myself for that. Physicality is the touchstone for direct physical loss or damage. Plethora of decisions that we've cited, including from nine of the 11 circuit courts of appeals, say that and they're addressing, I think, the laws of 17 states in those circuits. Four state supreme courts that we've now cited, to your honors, have come out the same way about the need for physicality, loss of use, potential for the presence of the virus being insufficient. Eight state courts of appeals, including in many of those states,  coming out exactly this way. And here's the important thing and the thing that's astounding to me. I'm not the most experienced or most elder attorney practicing, but I've never seen a circumstance like this where I can say as an advocate that none of those circuit courts of appeals decisions, none of those state supreme court decisions, even with their larger panels involved, none of those state court of appeals decisions had any dissent. None. And if one wants to see what the law in America is more broadly, then one can look there and then match it up with these general principles of insurance law, insurance interpretation, that one sees in Connecticut and match those across the board to all those other states. And let's just stick with the state supreme courts and the state courts of appeals. So we go to a place like Iowa or go to a place like Wisconsin and you'll see the same general principles of law stated as are stated in the briefing by both sides here as to the general principles of Connecticut law. And I don't think that one can effectively say, well, the general principles are different because the Connecticut Supreme Court hasn't addressed this exact language per se in a precedent. They have addressed the idea of physicality. And we clearly have a lack of physicality in the allegations here. The allegations here are that there's a potential that the germs were at our place of business, not even that they were actually there. But there's no allegation that there was complete lack of use of the property, right? None whatsoever. As a matter of fact, it's clear from the complaint that the day that they went back into the property, there was no observable difference physically than the day that they cut back on their schedule. Remember, we're not dealing with a closure of this property. We're dealing with a less robust appointment book for a short period of time in response to government orders and suggestions from state health officials. And when we're talking about hypotheticals a moment ago, I would sit in there thinking, well, gee, if we read this as broad as Farmington wants to, what happens if it rains and you have an outdoor patio? That's a temporary loss of use. I don't know that it's good policy to conflate that into direct physical loss or damage to the patio for these six or seven hours that the rainstorm might keep the business from using that outdoor patio. It certainly costs them money if they're used to generating revenue out of that patio during the good months here at this latitude. A quick note about the air. This always kind of catches my attention. The policy defines covered property in a way that does not include air as covered property. Moreover, I think it's pretty clear, if the court wants to get into it, that even in Connecticut, one cannot own the air. There's a difference between air rights on the one hand and the actual air itself. And what we're dealing with is the proposition of whether there's direct physical loss or damage to the air, an air that's not capable of ownership by anybody. Farmington can't charge people to come in for breathing their air. And then when the door opens, that air goes out and down the street and into another building. Farmington can't charge the people at that other building for breathing their air, or vice versa. That's just not the way it works. Going back to Justinian, air has just been something that is not capable of ownership by people. And so at the end of the day, we've got a party, Farmington, that chose to be in the federal courts. And after choosing to be in the federal courts, lost in the U.S. District Court, and it doesn't take much of a wet finger up in the air to see what this court has done in substantially similar, if not identical, cases like Rye Ridge, 112 Holdings, Kim Chi, and SA Hospitality. So now we're faced with this argument that, well, we don't want to be here after all. We'd like to go to the Connecticut Supreme Court and tee this up again. As to how long we ought to wait, I think the problem is that we don't have the surety that this is absolutely positively going to be decided by the Connecticut Supreme Court in September or later. And as a consequence, I don't see a compelling argument that, well, we should wait. That argument is a slippery slope, by the way. One could always argue to this and other panels of this court, well, let's just wait till the state Supreme Court gets to it, if they ever do. Just park it over here, and it might take a couple of years, but no harm done. Let's just wait and see what they do. That, I think, is a terrible place to go in a situation where there's a doctrine of finality and a need for finality in these cases, particularly when a litigant chooses to go to federal district court under diversity jurisdiction and use that court to decide state law. It just seems to me that this is a dribble, right, head fake, let's try to go left now. And that doesn't strike Cincinnati as good public policy or fair in this case. It looks like my time is up, so I will just ask this court to affirm the court below as to all matters and to deny the motion for certification. If there are no further questions, thank you very much for your attention. Thank you very much. Mr. Tanneher, you have exactly 90 seconds. Thank you, Your Honor. It's going to take me 90 seconds against the clock. We'll wait for you. Okay, first of all, counsel is incorrect with regards to what is before the Connecticut Supreme Court in September. Hartford Fire has assured that the grant of coverage language, which is analogous to what we have here, is going to be before the Supreme Court in September. It's actually spoken to in one of the cases that is going up by the decision, but Hartford Fire has already made it a point of the cross appeal. So that language is before the Connecticut Supreme Court as a result of Hartford Fire's actions. It will necessarily be decided by the Connecticut Supreme Court? Well, it's been presented by the Hartford Supreme Court, I mean, by the Hartford and accepted by the Supreme Court. But if it's a cross appeal, if the appeal fails on whatever ground the appeal, oh, I see, but the cross appeal is in... I guess I'm not sure what the... So Mota appealed, Hartford cross appealed, and so Mota's going to... And I think the original appeal includes the coverage language as well, but Hartford made sure it was there on the cross appeal. But is it only a backup argument for them? No. Do they need to win on that issue for them to prevail? They want that issue decided by the Connecticut Supreme Court. I know they want. We all have wants. Yes, right. The question is, do they need that decided in their favor to prevail in the case? Yes. We'll take a look at these, obviously. Yeah, right. I encourage support, and we're happy to... I think we submitted a 28-J letter that spoke to this, so it may be set forth in that 28-J. Just to be very clear, Mr. Donohue, the motion to certify is now withdrawn or defunct or is no longer in play. What you're asking for is simply for us to defer decision pending the Connecticut Supreme Court's decision, not of this issue whenever they get to it at any point in the future in recorded history, but pending the resolution of the cases that are being argued in September. That's your request at the moment. That's my request at the moment, Your Honor. I think this is, given where we are at the moment, if we went the motion to certify route right now, it would take longer to get this before the next... That you'd have to have briefing, and it would all start over again. Right. We are going to be fully briefed on all of these issues by the end of this month, and heard, I think, I can't be sure of this, but essentially the first week in September. I might be off a week, but we think... The court has assured us it was, in fact, it insisted that it be heard in the first term, which is September. I want to... We gave you 90 seconds for rebuttal, so you're over. So if you want to just give you 10 seconds to wrap up, because we do have your briefs. Yeah, I just want to make this point. With regard to the air issue, Your Honor, there is a Connecticut Supreme Court case that speaks to the air rights that one has. Gangemi versus Zoning Board of Appeals, 255 Connecticut 143, and it says that the right to use one's own property is one of the bundle of rights taken together constitute the essence of ownership of property. It is part of... Lastly, last point. We all received... Well, I don't know if you received, but I received late Friday afternoon a 28-J letter that included a bunch of cases. I have not had a chance to read all the cases. I took a look just in the middle of the pack at the Wacona Club case that counsel cited, and the Wacona Club case speaks to... Cites cases where there is no physical damage, but it finds in favor of the insurer because there is no allegation of presence of virus on the property. Okay, we have your argument. Thank you very much to both counsel. It was very well argued, and we really appreciate both of your efforts. You're welcome. Thank you very much. We will reserve decision. Let's move to...